# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 18, 2009 Session

## STATE OF TENNESSEE v. ADAM CLYDE BRASEEL

### Direct Appeal from the Circuit Court for Grundy County
#### No. 4221    Buddy Perry, Judge

---

### No. M2009-00839-CCA-R3-CD - Filed September 17, 2010

---

Following a jury trial, Defendant, Adam Clyde Braseel, was convicted of first degree premeditated murder, first degree felony murder, especially aggravated robbery, a Class A felony, attempt to commit first degree murder, a Class A felony, aggravated assault, a Class C felony, and assault, a Class A misdemeanor. The trial court merged Defendant's convictions for first degree premeditated murder and first degree felony murder and sentenced him to life imprisonment for his murder conviction. The trial court sentenced Defendant to fifteen years for each Class A felony conviction, three years for his Class C felony conviction, and eleven months, twenty-nine days for his misdemeanor conviction. The trial court ordered Defendant to serve his sentences concurrently for an effective sentence of life with the possibility of parole. On appeal, Defendant challenges the sufficiency of the convicting evidence for murder, especially aggravated robbery and aggravated assault and argues that the pre-trial identification processes were unduly suggestive. After a thorough review, we conclude as plain error that Defendant's convictions of the attempted first degree premeditated murder of Rebecca Hill in count four of the indictment and the aggravated assault of Ms. Hill in count five violate double jeopardy principles. Accordingly, we merge Defendant's conviction of aggravated assault into his conviction of attempted first degree murder. We also find that the trial court's judgments of conviction for first degree premeditated murder and first degree felony murder do not clearly reflect the trial court's merger of the felony murder conviction into the premeditated murder conviction. We affirm the trial court's judgments as to Defendant's convictions of first degree premeditated murder, attempted first degree murder, especially aggravated robbery, and assault, and his effective sentence of life with the possibility of parole. We remand solely for the correction and entry of appropriate judgments consistent with this opinion.

### Tenn. R. App. P. Appeal as of Right; Judgment of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Robert S. Peters, Winchester, Tennessee (on appeal and at trial) and Floyd Davis, Winchester, Tennessee (at trial) for the appellant, Adam Clyde Braseel.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; James Michael Taylor, District Attorney General; Steven Strain, Assistant District Attorney General; and David McGovern, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Rebecca Hill testified that the murder victim, Malcolm Burrows, was her brother. Mr. Burrows was sixty years old at the time of his death on January 7, 2006, and he was in poor health. Ms. Hill said that she moved into her brother's home on Melissa Rock Road approximately three or four months prior to the offenses, and Ms. Hill's son, Kirk Braden, also stayed periodically at the house.

Ms. Hill stated that on Saturday, January 7, 2006, a young man, whom Ms. Hill identified at trial as Defendant, came to the door between 9:00 p.m. and 9:15 p.m. Defendant told Mr. Burrows that his vehicle would not start and asked for Mr. Burrows' help. Defendant told Mr. Burrows that he did not know if the vehicle was out of gas or had a technical problem. Mr. Burrows grabbed a can of gasoline and a battery charger and left with Defendant. Ms. Hill said that the two men were talking and laughing as they went out the door. Ms. Hill stated that Mr. Burrows and Defendant drove away in her blue Chrysler.

A short time later, Defendant returned to the house and told Ms. Hill that Mr. Burrows had sent him to retrieve a can of starter fluid which was stored in the cabinet beneath the kitchen sink. Ms. Hill squatted down and began to search through the items in the cabinet. Defendant asked Ms. Hill if her nephew was staying with her. Ms. Hill told Defendant that her son stayed with her and that he was upstairs.

Defendant suddenly began hitting Ms. Hill on her head with an object which Ms. Hill described as approximately twelve to eighteen inches long. Defendant struck Ms. Hill several times, and Ms. Hill tried to crawl to the living room. Defendant kept hitting her, and Ms. Hill screamed for her son. Mr. Braden rushed into the room and began to struggle with Defendant. Mr. Braden struck Defendant on the jaw, and Defendant ran out of the house.

Ms. Hill stated that she did not remember what happened between the arrival of the emergency personnel on Saturday and the following Wednesday or Thursday night when she regained consciousness in the hospital. Ms. Hill learned from her niece that Mr. Burrows had

been killed. Ms. Hill said that Mr. Burrows always carried his wallet with him. Ms. Hill stated that Mr. Burrows had approximately $800 in his wallet on the night he was killed, which included approximately $400 or $500 of her money which she had given Mr. Burrows for safekeeping. Ms. Hill stated that she identified Defendant as the perpetrator from a photographic lineup at the Grundy County Jail a few days after she was released from the hospital.

On cross-examination, Ms. Hill stated that Defendant's "expressions [sic] was different" when he returned for the starter fluid, but he did not appear angry. Ms. Hill said that she did not notice any blood on Defendant's clothes, and she did not recollect whether Defendant was wearing gloves. Ms. Hill said that she immediately recognized Defendant from his photograph. On redirect examination, Ms. Hill described Defendant when he came to the house the second time as pale with "clammy" skin. Ms. Hill said, "His eyes was [sic], like, didn't blink. They was [sic] just like – they stayed wide open."

Kirk Braden testified that he was asleep on the evening of January 7, 2006, and did not wake up until he heard Ms. Hill screaming. Mr. Braden rushed into the kitchen. Mr. Braden stated that Ms. Hill was kneeling, and Defendant was striking her with a sharp object between twelve and twenty-four inches in length. Mr. Braden pulled Defendant away from Ms. Hill and struck him in the cheek area with his fist. Defendant grabbed a fire extinguisher from the cabinet beneath the sink and threw it at Mr. Braden, striking him on the shoulder. Mr. Braden chased Defendant out of the house. Mr. Braden said that Defendant drove away in a gold vehicle which had a dent near the right front fender and a sunroof. At trial, Mr. Braden identified the photograph of a gold vehicle belonging to Imogene Davis, Defendant's mother, at trial as the vehicle Defendant was driving on the night of the offenses. After Defendant left, Mr. Braden found a baseball bat engraved with "Chicago White Sox" on the kitchen floor. The bat had been broken into two pieces. Mr. Braden said that he not seen the bat before that evening, and he put the two pieces of wood in the kitchen trash can.

Mr. Braden described Defendant to the police officers as a medium built man with short, red hair. Mr. Braden stated that Defendant was wearing a white ball cap, a sweater, and blue jeans. Mr. Braden identified the ball cap found in Defendant's vehicle on January 8, 2006, as the cap that Defendant was wearing on the night of the offenses. Mr. Braden identified Defendant as the perpetrator two days after the offenses from a set of photographs at the Grundy County Jail. Mr. Braden also identified Defendant as the perpetrator at trial.

Angela White testified that she and her husband, Jeff White, were Mr. Burrows' neighbors. Ms. White said that she lived on a dead end road with little traffic other than the residents. Mr. Burrows' house was visible from Ms. White's property. Ms. White stated that on January 6, 2006, she noticed an unfamiliar gold vehicle with a dent in the front parked in her yard facing toward the victim's house. Ms. White said that the gold vehicle and another

vehicle had been "in and out" during the day. The gold vehicle was not in her yard when she called her children into the house at approximately 4:00 p.m. Ms. White heard her dog bark at approximately 6:45 p.m. She looked out the window and observed the gold vehicle again parked at the front of her yard.

Andrew Martin West, a patrol officer with the Grundy County Sheriff's Department, responded to the 911 call which had been placed by Mr. Braden at approximately 9:52 p.m. Just before he reached the house, Officer West observed an older dark-colored Chrysler parked on the right hand side of the road. Officer West continued on to Mr. Burrows' house and obtained a description of the man who had been in Mr. Burrows' house that night and the vehicle he was driving. Officer West returned to the parked Chrysler and checked the vehicle's registration. Officer West found a battery charger sitting on the road next to the Chrysler, but he did not see the driver. Sergeant Troy Brown, with the Franklin County Sheriff's Department, later spotted Mr. Burrows' body lying face down in the woods approximately six to eight feet from the Chrysler.

Special Agent Larry Davis with the Tennessee Bureau of Investigation (T.B.I.), testified that he was notified at approximately 1:00 a.m. on January 8, 2006, that a body had been found on Melissa Rock Road in Tracy City. When he arrived at the scene, Special Agent Davis observed signs of a struggle near the Chrysler, and it appeared that Mr. Burrows had suffered massive trauma wounds to his head. Mr. Burrows did not have a wallet in his pants pocket.

Special Agent Davis drove up to Mr. Burrows' residence. He found a large amount of blood in the doorway to the home, and there was a puddle of blood on the floor beneath a kitchen chair. The door to the cabinet beneath the sink was open and a number of containers were sitting on the floor next to the open cabinet. A red fire extinguisher was found in a living room chair, and a broken bat with what appeared to be blood stains on it was found in one of the trash cans. Special Agent Davis stated that the blood puddle beneath the kitchen chair indicated that Ms. Hill had sat down for a few minutes while bleeding from her wounds. The blood spatter on the floor was consistent with Ms. Hill bleeding profusely as she fell to the floor.

Special Agent Davis stated that Defendant was developed as a suspect the following day. Special Agent Davis and other officers drove to the home of Defendant's mother, Imogene Davis, and Ms. Davis verified that she owned a gold Acura. Ms. Davis said that Defendant had driven the Acura to the mountain where he had spent the night with a friend. After the law enforcement officials left, Ms. Davis drove away from her home in another vehicle.

Chief Deputy Lonnie Cleek, with the Grundy County Sheriff's Department, received a telephone call from Special Agent Davis on January 8, 2006, alerting him that Imogene Davis was traveling toward Grundy County on Highway 50 in a red or maroon vehicle. Chief Deputy Cleek followed Ms. Davis' vehicle until she turned into the driveway of the Seagroves' residence. Defendant was standing in the driveway next to a gold Acura. Defendant consented to a search of the vehicle. Chief Deputy Cleek retrieved a jacket and a baseball cap from the Acura, and the Acura was towed to the sheriff's department for processing because the engine would not start. Defendant was then transported to the Grundy County jail. Chief Deputy Cleek attempted to show Ms. Hill a photographic lineup after she was released from the hospital, but she was still on medication. Ms. Hill later came to the sheriff's department to view the photographic lineup. Chief Deputy Cleek said that Ms. Hill "rather quickly" identified Defendant as the perpetrator.

Grundy County Sheriff Brent Myers testified that he began to prepare a photographic lineup after Defendant was identified as a suspect. Mr. Braden stopped by the sheriff's department on January 9, 2006, as Sheriff Myers was sorting through a number of photographs on his desk which included Defendant's photograph. Mr. Braden sat down and spontaneously identified Defendant as the perpetrator from the group of photographs. Sheriff Myers handed Mr. Braden all of the photographs and told him to make sure that he had picked out the right photograph, and Mr. Braden again identified Defendant. Sheriff Myers stated that he showed Mr. Braden the baseball cap taken from Defendant's Acura, and Mr. Braden identified it as the cap Defendant was wearing on the night of the offenses.

Dr. Feng Li, an assistant medical examiner for Nashville and Davidson County, testified that he performed an autopsy on Mr. Burrows. Dr. Li discovered lacerations on the right side of the top of Mr. Burrows' head, the left side of his forehead, above his right eyebrow, on the right ear lobe, and on the top of the his head. Dr. Li stated that all of the lacerations caused skull fractures, and "basically the skull [was] broken in[to] two pieces." Dr. Li said the skin abrasions from the lacerations were uneven and consistent with the infliction of blunt force injuries. Dr. Li stated that a fist alone would not have caused Mr. Burrow's injuries.

Dr. Li also found several contusions on Mr. Burrows' face, left shoulder, left forearm, right upper arm, the right edge of his tongue, and the back of his right hand. Dr. Li categorized the contusions of the victim's hands and shoulders as defense wounds. Dr. Li said that Mr. Burrows also sustained a fracture in his lower jaw, and suffered subdural and subarachnoid hemorrhages. Dr. Li stated that Mr. Burrows died as a result of multiple blunt force injuries.

Elizabeth Reed, a special agent forensic scientist with the Tennessee Bureau of Investigation (T.B.I.), testified that she did not find any identifiable fingerprints on various

items related to the crime scene including the Chrysler, the battery charger found next to the Chrysler, and the broken baseball bat found in Mr. Burrows' kitchen. Special Agent Reed stated that she found partial fingerprints on the fire extinguisher, but the details were insufficient to tell who had handled it.

Margaret Bash, a T.B.I. special agent specializing in serology and DNA analysis, testified that she did not find any blood on either the fire extinguisher or the black and white baseball cap. Special Agent Bash, however, found the presence of human blood on the baseball bat. Special Agent Bash was able to construct a partial DNA profile from the bat's blood stains, and the profile was consistent with Ms. Hill's DNA sample. Special Agent Bash stated that her examination of Defendant's jacket and gloves, as well as a tire tool and a stick from Defendant's vehicle, did not reveal the presence of any blood.

The State rested its case-in-chief, and Defendant presented his defense. Jeffrey Wade Wright, Mr. Burrows' neighbor, testified that he went to Mr. Burrows' house after the commission of the crimes. Mr. Wright said that he and Mr. Braden talked, but Mr. Braden did not mention seeing a vehicle in the driveway. On cross-examination, Mr. Wright stated that Mr. Braden told him that the perpetrator had run out of the house onto the road leading to Melissa Rock Road.

Charles Richard Partin, Jr., testified that Defendant was at his residence in Coalmont from Friday afternoon, January 6, 2006, until approximately 9:00 p.m. on Saturday, January 7, 2006. Mr. Partin stated that he left his house at approximately 9:15 p.m. on that Saturday night, and Defendant left "a few" minutes before him in a small, four door vehicle. Mr. Partin said that he had not talked to Defendant since the commission of the offenses. On cross-examination, Mr. Partin stated that Defendant was more of an acquaintance than a friend.

Kristen King testified that she and her boyfriend, Jake Baum, pulled into a church parking lot in Coalmont on January 7, 2006, between 9:00 p.m. and 10:00 p.m. Ms. King stated that Defendant pulled up beside them. Mr. Baum introduced Ms. King to Defendant, and then Mr. Baum and Defendant talked for approximately ten to fifteen minutes. Mr. Baum then drove Ms. King home. Ms. King stated that she did not know anything about the case until the night before trial.

On cross-examination, Ms. King stated that she remembered the incident because her father's birthday was on January 4. Ms. King, however, said that she could not remember what she did on January 5, January 6, or during the day on January 7, 2006. Ms. King stated the did not know whether January 7, 2006, fell on a Saturday.

Joshua Seagroves testified that he had known Defendant since his freshman year in high school. Mr. Seagroves stated that Defendant arrived at his house on January 7, 2006, at approximately 10:00 p.m. Mr. Seagroves said that Defendant did not appear to be upset, and he did not see any signs that Defendant had been in a fight. Defendant spent the night and did not leave the house until Sheriff Myers and Chief Deputy Cleek arrived on Sunday, January 8, 2006.

On cross-examination, Mr. Seagroves said that he remembered talking to Deputy Jason Layne with the Grundy County Sheriff's Department. Mr. Seagroves stated, however, that the portion of his statement to the police stating that Defendant arrived at his house at 11:00 p.m. on January 7, 2006, was not accurate. Mr. Seagroves stated that he had not seen Defendant in "probably weeks, maybe months" before January 7, 2006. Mr. Seagroves said that he did not recollect that Defendant was wearing a baseball cap that night.

Defendant testified that he was twenty-four years old at the time of the trial, and he had been married for approximately eighteen months. Defendant said that he lived in Manchester and was employed by a painting company. Defendant stated that he knew who Mr. Burrows was, but he did not know him personally. Defendant also stated that he did not know where Mr. Burrows lived, and he did not know either Ms. Hill or Mr. Braden.

Defendant stated that he had returned to Grundy County approximately five or six times after moving to Manchester. Defendant said that he traveled from Manchester to Grundy County on Friday, January 6, 2006, after work. Defendant stated that he stayed with Charles Partin and was with him all day on January 7, 2006. Defendant said that he left Mr. Partin's house at approximately 9:15 p.m. or 9:30 p.m. on the evening of January 7, 2006, in a 1995 gold Acura. Defendant ran into Mr. Baum at the Coalmont Church and the two men conversed for approximately five minutes. Defendant then drove to Mr. Seagroves' house, arriving at approximately 10:00 p.m., and spent the night. Defendant said that he was with Mr. Seagroves until the law enforcement officials arrived the next day. Defendant stated he agreed to a search of his vehicle and allowed the officers to take his photograph. Defendant denied that he went to Tracy City on January 7, 2006, and denied that he committed the offenses.

On cross-examination, Defendant acknowledged that he told Chief Deputy Cleek that he had known Mr. Burrows all of his life, and that his mother also knew Mr. Burrows. Defendant said that he learned that Mr. Burrows had been killed and that he was a suspect on January 8, 2006, approximately thirty minutes to one hour prior to Chief Deputy Cleek's arrival. Defendant stated that he had not had any problems with the Acura, and he did not know how the deputies removed the Acura from Mr. Seagroves' house. Defendant said that he remembered seeing Mr. Baum after he had talked to the deputies. Defendant acknowledged that, except for Ms. King's testimony, there was a gap in time from

approximately 9:00 p.m. when he left Mr. Partin's house and when he arrived at Mr. Seagroves' house between 10:00 p.m. and 10:30 p.m. Defendant acknowledged that he called Mr. Baum on January 8, 2006, to remind Mr. Baum that he was with Defendant on the evening of January 7, 2006.

Defendant acknowledged that he gave a statement to Chief Deputy Cleek at the Seagroves' residence, and that he did not tell Chief Deputy Cleek that he had been with Mr. Baum after he left Mr. Partin's house and before he arrived at Mr. Seagroves' house. Instead, he told Chief Deputy Cleek that he left Mr. Partin's house between 9:00 p.m. and 9:30 p.m. on January 7, 2006, that he rode around for approximately twenty minutes, and then drove to Mr. Seagroves' house. Defendant acknowledged that he also did not tell Chief Deputy Cleek that he had been at Mr. Partin's house on Friday, January 6, 2007. Defendant acknowledged that Mr. Partin was just an acquaintance, and said that he knew him because he was friends with Mr. Partin's brother, B.J.

Special Agent Davis testified as a rebuttal witness. Special Agent Davis stated that the distance between Mr. Partin's residence and Mr. Seagroves' residence was 2.8 miles and took approximately four minutes to drive. The distance between the location where Mr. Burrows' body was found and Mr. Seagroves' residence was six miles and took approximately ten minutes to drive.

## II. Photographic Line-up

Defendant argues that Ms. Hill's and Mr. Braden's pre-trial identification of Defendant as the perpetrator resulted from an impermissibly suggestive process which violated his due process rights. The State argues that Defendant has waived this issue because he failed to file a motion to suppress the photographic line-ups prior to trial and failed to object to the testimony at trial.

Rule 12(b)(2)(C) of the Tennessee Rules of Criminal Procedure provides that motions to suppress evidence must be filed prior to the trial. *See State v. McCray*, 614 S.W.2d 90, 94 (Tenn. Crim. App. 1981). "The rule is applicable when a claim of a constitutional right is involved whose violation would lead to suppression of evidence." *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998). Failure to timely present a motion to suppress to the trial court constitutes a waiver of the issue for appellate review, "in the absence of 'cause shown' for the failure." *Goss*, 614 S.W.2d at 94.

The record does not contain a motion to suppress the identification testimony of Ms. Hill and Mr. Braden. Furthermore, the transcript of the trial does not indicate that Defendant objected to the introduction of this evidence, and the photographic line-up shown to Ms. Hill was introduced as an exhibit at trial without objection during her direct examination. *See*

Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). "When a party does not object to the admissibility of evidence, the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *State v. Smith*, 24 S.W.3d 274, 280 (Tenn.2000) (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn.1981)). Although Defendant raised the issue of identification in his motion for new trial, Defendant did not present the trial court with any "good cause" for his failure to file a motion to suppress before trial. *See Goss*, 614 S.W.2d at 94.

Based on the foregoing, we conclude that this issue is waived. Defendant is not entitled to relief on this basis.

## III. Sufficiency of the Evidence

On appeal, Defendant argues that the evidence was insufficient to support his convictions. When a defendant challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A. Offenses Against Mr. Burrows

Defendant was convicted of the first degree premeditated murder, first degree felony murder, and especially aggravated robbery of Mr. Burrows. Defendant argues that the evidence was insufficient to support these convictions because there were no witnesses to the crimes and no physical evidence was found implicating Defendant in the commission of the

offenses. Defendant also submits that there was no evidence of planning, motive, or any other circumstance that would support a finding that the murder was premeditated.

Although not raised by either party on appeal, we must first address the merger of Defendant's dual convictions of first degree premeditated murder and first degree felony murder as charged in counts one and two of the indictment. Our law clearly provides for the "merger of multiple convictions of first degree murder involving a single victim." *State v. Kiser*, 284 S.W.3d 227, 234 (Tenn. 2009). Thus, as relevant here, Defendant's conviction of first degree felony murder in count two of the indictment is merged into his conviction of first degree premeditated murder in count one. We observe that the trial court entered dual judgments of conviction for the two murder offenses. Each judgment simply notes on the bottom of the form that "Counts I and II merge" without more specificity and, therefore, do not properly reflect the trial court's merger of offenses. Therefore, we remand for the entry of an appropriate judgment reflecting the merger of Defendant's conviction of first degree felony murder into his conviction of first degree premeditated murder for a single judgment of conviction.

Having said that, however, we observe that Defendant's felony murder conviction is not extinguished; it simply mergers into the premeditated murder conviction for a single judgment of conviction. *State v. Justin Brian Conrad*, No. M2008-01342-CCA-R3-CD, 2009 WL 3103776, at *9 (Tenn. Crim. App., at Nashville, Sept 29, 2009), *perm. to appeal denied* (Tenn. Feb. 22, 2010). Therefore, we will also address the sufficiency of Defendant's "merged" conviction for felony murder in the event of further review. *Id.*; *State v. Phillip Douglas Seals*, No. E2007-02332-CCA-R3-CD, 2009 WL 55914, at *8 (Tenn. Crim. App., at Knoxville, Jan. 9, 2009), *perm. to appeal denied* (Tenn. May 26, 2009).

As relevant here, first degree murder is defined as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation refers to "an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). Premeditation "means that the intent to kill must have been formed prior to the act itself." *Id*. However, the intent to kill may be formed in an instant and need not pre-exist in the mind of the accused for any definite period of time. *Id*. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *Bland*, 958 S.W.2d at 660. Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the defendant's shooting of the victim after he had turned to retreat or escape; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon,

preparations to conceal the crime before the crime is committed, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Leach,* 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971).

A person commits first degree felony murder who kills another in the perpetration or attempt to perpetrate several enumerated felonies, including, as relevant here, robbery. T.C.A. § 39-13-202(a)(2). Especially aggravated robbery is robbery as defined in section 39-13-401 which is accomplished with a deadly weapon and where the victim suffers serious bodily injury. *Id*. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the victim in fear." T.C.A. § 39-13-401(a).

Viewing the evidence in a light most favorable to the State, Angela White testified that Mr. Burrows' house was visible from her house. On January 6, 2006, Ms. White observed an unfamiliar gold vehicle with a dent in the front of the vehicle parked in her front yard facing toward Mr. Burrows' house. Ms. White said that the gold vehicle and another vehicle came and went periodically throughout the day. Ms. White last observed that gold vehicle at approximately 6:45 p.m.

The following evening, on January 7, 2006, Defendant approached Mr. Burrows' house for assistance with his vehicle. Mr. Burrows collected a can of gasoline and a battery charger and left with Defendant in Ms. Hill's blue Chrysler. Ms. Hill testified that Mr. Burrows always carried his wallet in his pocket when he left the house, and that he had approximately eight hundred dollars in his wallet on the night of the offenses. Agent Davis found a battery charger at the rear of the Chrysler on the passenger side and detected signs of a struggle next to the Chrysler. Mr. Burrows' body was found approximately six to eight feet from the Chrysler, with severe injuries to the head. Dr. Li testified that a fist alone could not have inflicted Mr. Burrows' injuries. Agent Davis stated that Mr. Burrows did not have a wallet in his pocket. Imogene Davis confirmed that she owned a gold Acura, and that Defendant was driving the Acura at the time of the offenses.

Mr. Braden stated that he saw a gold Acura with a dent in the front parked in the driveway when Defendant ran out of the house after his confrontation with Mr. Braden. Mr. Braden identified a photograph of Defendant's vehicle at trial as the vehicle he saw in the driveway. Mr. Braden described the perpetrator to the investigating officers as a medium built man with short red hair and wearing a white ball cap, a sweater, and blue jeans. Two days after the offenses, Mr. Braden identified Defendant as the perpetrator from a number

of photographs he saw in Sheriff Myers' office at the Grundy County jail. Mr. Braden also identified Defendant as the perpetrator at trial.

Based on the foregoing, we conclude that a rational trier of fact could conclude beyond a reasonable doubt that Defendant was the perpetrator of the offenses, that Mr. Burrow's murder was premeditated, and that the murder was accomplished during the especially aggravated robbery of Mr. Burrows. Accordingly, we conclude that the evidence is sufficient to support Defendant's convictions of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. Defendant is not entitled to relief on this issue.

B. Offenses Against Ms. Hill

Defendant was convicted of the attempted first degree premeditated murder and aggravated assault of Ms. Hill. As noted above, first degree murder is defined in relevant part as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Attempt, as relevant to first degree murder, occurs when a person, "acting with the kind of culpability otherwise required for the offense . . . acts with the intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-13-101(a)(2).

For the purposes of the case *sub judice*, an aggravated assault is committed when a person intentionally or knowingly commits an assault as defined in section 39-13-101 and causes serious bodily injury to another. T.C.A. § 39-13-102(a)(1)(A). A person commits an assault who "intentionally or knowingly causes bodily injury to another." *Id*. §§ 39-13-101(a)(1).

Viewing the evidence in a light most favorable to the State, after killing Mr. Burrows, Defendant returned to the residence instead of driving away from the scene. Defendant told Ms. Hill that Mr. Burrows' had sent him to retrieve the can of starter fluid beneath the kitchen sink. After Ms. Hill squatted down to look in the cabinet, Defendant questioned her about who else was in the house. Ms. Hill said her son was upstairs. Ms. Hill stated that Defendant began to strike her on her head. Ms. Hill tried to get away, but Defendant kept striking her. Ms. Hill suffered serious bodily injury and was unconscious from Saturday night until the following Wednesday or Thursday. Ms. Hill testified that she viewed a photographic line-up at the Grundy County jail a few days after she was released from the hospital and immediately identified Defendant as the perpetrator from the eight photographs. Chief Deputy Cleek said that Ms. Hill, although emotional, identified Defendant's photograph from the line-up without any hesitation. Ms. Hill described Defendant to the investigating officers as a young, small man, with red hair, and a fair complexion. Ms. Hill also identified Defendant as the perpetrator at trial. Based on the foregoing, we conclude that

a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of attempted first degree premeditated murder and aggravated assault.

Notwithstanding the sufficiency of the convicting evidence, however, we are constrained to consider as plain error whether Defendant's dual convictions for attempted first degree premeditated murder and aggravated assault violate double jeopardy protections. *See* Tenn. R. App. P. 36(b) (providing that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"). Dual convictions resulting in a violation of a defendant's protection against double jeopardy constitute "plain error." *See State v. Lewis*, 958 S.W.2d 736, 738 (Tenn. 1997); *State v. Epps*, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998) (applying plain error doctrine to review whether the defendant's dual convictions violated double jeopardy principles).

In order for us to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

The record clearly establishes that Defendant was convicted of both attempted first degree premeditated murder and aggravated assault. Second, multiple convictions for the same offense breach a clear and unequivocal rule of law. Third, a fundamental constitutional right of Defendant, his Fifth Amendment right to be free from double jeopardy, is affected. Fourth, the record is devoid of any evidence that Defendant waived the issue for tactical reasons. Fifth, we conclude that consideration of a violation of Defendant's double jeopardy protections is "necessary to do substantial justice." Accordingly, we will review this issue as plain error.

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, under our Tennessee Constitution, "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. Three fundamental principles underlie double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). The case *sub judice* involves the third scenario, that is, multiple punishments for the same offense.

In determining whether two offenses are the "same" for double jeopardy purposes, the *Blockburger* test requires a comparison of the statutory elements of attempted first degree premeditated murder and aggravated assault. *Blockburger v. United States*, 284 U.S. 299, 307, 52 S. Ct. 180, 182; *State v. Black*, 524 S.W.2d 913, 919 (Tenn. 1975). "If each statutory provision setting forth the offense requires proof of an additional fact which the other does not, then the two offenses are not the same for federal double jeopardy protection purposes. *State v. Hall*, 947 S.W.2d 181, 183 (Tenn. Crim. App. 1997) (citing *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182).

As relevant here, first degree murder is defined as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Attempted first degree premeditated murder is committed when the accused, with premeditation, intentionally acts with the intent to cause the killing and believes his conduct will cause the victim's death without further conduct on his or her part. *Id*. § 39-13-101(a)(2). As charged in the indictment, aggravated assault requires proof that Defendant committed an assault on the victim involving bodily injury, and the bodily injury was serious. Thus, attempted first degree premeditated murder requires an intent to kill while aggravated assault does not. Aggravated assault requires an assault which results in serious bodily injury, neither element of which is required to support a conviction of attempted first degree premeditated murder. Therefore, the two offenses are valid under the *Blockburger* test.

Nonetheless, in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), "our supreme court extended double jeopardy protection under the Tennessee constitution beyond that provided by the federal constitution." *Hall*, 947 S.W.2d at 183. In addition to the *Blockburger* test, the trial court must consider the "same evidence" test as articulated *in Duchac*, that is whether the same evidence is required to prove the offenses. *Denton*, 938 S.W.2d at 381 (citing *Duchac v. State*, 505 S.W.2d 237, 239 (Tenn. 1973)). This test states in pertinent part:

> A defendant has been in jeopardy if on the first charge he could have been convicted of the offense charged in the second proceeding. One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by the statutes.

*Duchac*, 505 S.W.2d at 239. Finally, the trial court must analyze whether there were multiple victims or discrete acts and compare the purposes of the respective statutes. *Denton*, 938 S.W.2d at 381.

It is apparent from a review of the record that the State relied on the same evidence to support Defendant's dual convictions of attempted first degree premeditated murder and

aggravated assault. That is, Defendant's conduct of striking Ms. Hill on the head resulting in serious bodily injury supported both the attempted murder conviction in count four of the indictment and the aggravated assault conviction in count five. *See Hall*, 947 S.W.2d at 183-84 (determining that convictions for attempted second degree murder and aggravated assault violated double jeopardy when the dual convictions were based on the same evidence, and the statutes preventing the crimes had the same purpose, that is "to prevent physical attacks upon persons"); *State v. Adams*, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997) (determining that a single attack by the defendant on the victim which provided the evidence to support the defendant's conviction of both attempted first degree murder and aggravated assault violated double jeopardy principles under the "same evidence" test in Denton); *State v. Marques Lanier Bonds*, No. W2005-02267-CCA-R3-CD, 2006 WL 2663753, at *9 (Tenn. Crim. App., at Jackson, Sept. 15, 2006), *no perm. to appeal filed* (determining that the defendant's convictions for attempted second degree murder and aggravated assault were the same for double jeopardy purposes because they were part of one continuous assault, with each gunshot being used to support dual convictions).

Because these convictions fail the *Duchac* prong of the test, we find as plain error that principles of double jeopardy bar Defendant's multiple convictions. We accordingly merge Defendant's conviction of aggravated assault into his conviction of attempted first degree premeditated murder.

## CONCLUSION

After a thorough review, we affirm Defendant's convictions of first degree premeditated murder, attempt to commit first degree premeditated murder, especially aggravated robbery, and assault. We remand solely for the purpose of entering appropriate judgments consistent with this opinion to clearly reflect the merger of Defendant's conviction of first degree felony murder in count two of the indictment into his conviction of first degree premeditated murder in count one of the indictment, and the merger of Defendant's conviction of aggravated assault in count five of the indictment with his conviction of attempt to commit first degree premeditated murder in count four of the indictment.

_____
THOMAS T. WOODALL, JUDGE